# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MUNEER AWAD

      Plaintiff / Petitioner

      v.

PAUL ZIRIAX, Agency Head, Oklahoma
State Board of Elections

THOMAS PRINCE, Chairman of the
Board, Oklahoma State Board of Elections

RAMON WATKINS, Board Member,
Oklahoma State Board of Elections;

SUSAN TURPEN, Board Member,
Oklahoma State Board of Elections

**CIV-10-1186 M**

CASE NO.:

HON.:

**FILED**

NOV 0 4 2010

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT WESTERN DIST. OF OKLA.
BY_____DEPUTY

---

## Memorandum in Support of Plaintiff's Motion
## for Temporary Restraining Order and Preliminary Injunction

    Plaintiff, Muneer Awad, submits this Memorandum in Support of his Motion for a

Temporary Restraining Order and Preliminary Injunction enjoining Defendants from

certifying the election results for State Question 755.



## INTRODUCTION

On November 9, 2010, Muneer Awad will notice that much of the bounty of religious liberty the Free Exercise and Establishment Clauses once supplied has, for him at least, vanished.  Muneer will look at the constitution only to turn away in offense at the condemnation of his faith enshrined there.  But there will be no escape from the stigma his community now reflexively associates with him.

Surely, people will whisper, there must be something deeply threatening about Muneer's faith.  For why else would the great state of Oklahoma allocate space in the state's most cherished document to burden Muneer's faith and no other.  There must be something hidden away commensurate to condemnation on such a grand scale.

Plaintiff, Mr. Muneer Awad, will face some iteration of the above dramatized consequences if this Court does not order Defendants to refrain from certifying the election results of State Question 755.

Approved by voters, State Question 755 will amend, upon certification, Oklahoma's constitution to erase from judicial cognizance anything "based on the Koran" or the "teaching of Mohammed" as the ballot so explained.  State courts will forever after be forbidden from "considering…Shariah Law."  Never mind the fact that the religious tradition to which "Shariah Law" presumably refers shares much content with other faiths. A state court still cannot consider content otherwise identical to content sourced from other traditions.  That content sourced from a religious tradition other

traditions, courts may still consider it when relevant.  It is the association with the term "Shariah Law" alone that triggers the exclusion from state courts.

State Question 755 is not a close call.  The amendment it will make once certified is a gross transgression of the Establishment Clause.  So gross is the violation that little precedent  deals with violations similar in magnitude.

Defendants must be injoined immediately from certifying State Question 755 so that Plaintiff does not suffer the indiscriminate and penetrating harm that will arrive when the constitution is amended but promises to linger long after.  After Tuesday, Plaintiff will sustain injury that even a favorable decision on the merits months from now cannot fully repair.

Today, no constitution of any state attaches special burdens on a religious tradition. Without a temporary restraining order and a preliminary injunction against Defendants, that will change on Tuesday.

## FACTS

Plaintiff, Mr. Muneer Awad, is a resident of Oklahoma City, Oklahoma where he lives with his wife.  Plaintiff has followed closely developments and media reports regarding State Question 755 which, if certified, would forbid courts from considering, among other things, "shariah law."  He has directly and repeatedly encountered the amended text State Question 755 would enact as well as media reports that comment on the amended text.

Plaintiff is a practicing Muslim and he relies upon the two core sources for insight into his faith: the Quran and the recorded teachings of Islam's prophet.

Plaintiff's faith is the motivation for much of what he does. From greeting others with a smile to waking for the customary prayer at dawn, Plaintiff avails himself of the Islamic religious traditions evolving out from the Quran and Islam's prophetic teachings.

Plaintiff's faith informs the character and content of his personal and professional relationships. The Quran and Islam's prophetic teachings allow Plaintiff access to the practical morality contained therein regarding prescribed and proscribed conduct in innumberable circumstances. Thus, when Plaintiff scrupulously attends to fairness in his business dealings, he acts from faith, having taken to heart guidance from Islam's prophetic teachings.

State Question 755 amends Article 7, Section I of Oklahoma's constitution. The initiative was described on the ballot to voters as a directive to state courts to "rely on federal and state law when deciding cases." The description states that the amendment would "forbid courts from considering or using international law." It would also "forbid courts from considering or using Sharia Law."

The ballot's explanation of what the amendment means when it excludes "Sharia Law" from state courts indicates that the aim of the phrase was to demarcate a religious tradition. "Sharia law" says State Question 755 is "Islamic law." While State Question 755 described what "Sharia Law" is based on—the "Koran and the teaching of

4

Mohammed"—it did not suggest what the actual content of the initiave's operative phrase, "Shariah Law," identified.

The text that State Question 755 places in Oklahoma's constitution forbids courts from considering Shariah Law twice. First, it forbids state courts from applying the law of other states, even when otherwise appropriate, if that law "include[s] Sharia Law." Second, the text uses broad language to forbid courts from "consider[ing] Sharia Law." No other religious tradition is mentioned.

State Question 755's chief proponents have repeatedly characterized the restriction it places on Shariah Law as a necessary bulwark against the invidious religious tradition it contains. The initiative's architects have variously referred to State Question 755 as a preemptive strike, a response to a looming threat, and as a much needed legal reinforcement to the Oklahoma's Judeo-Christian values.

Preliminary election results suggest that voters approved State Question 755. State Question 755 (hereinafter "Shariah Ban") will become a part of the constitution if the State Board of Elections certifies the results at its scheduled meeting on Tuesday, November 9, 2010.

Plaintiff is certain that having the knowledge that Oklahoma condemns his faith will cause offense and injury. He anticipates that such official disapproval of his faith will result in a stigma attaching to his person.

## ARGUMENT

Plaintiff is entitled to a temporary restraining order and a preliminary injunction, because (1) he is "likely to succeed on the merits, (2) he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities tips in his favor, and (4) granting Plaintiff preliminary relief is in the "public interest." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008). Here, each of these four factors weigh in favor of Plaintiff's request for a temporary restraining order and a preliminary injunction. However, even if this Court finds that Plaintiff does not demonstrate a likelihood to succeed on the merits but satisfies the other elements, this Court may still grant preliminary relief so long as Plaintiff has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (C.A.10 (Utah), 1980)

### (1) Plaintiff is Likely to Succeed on the Merits

**I.   THE SHARIAH BAN VIOLATES THE ESTABLISHMENT CLAUSE BECAUSE THE MEASURE HAS A PURPOSE AND EFFECT THAT IS SECTARIAN AND NECESSITATES EXCESSIVE RELIGIOUS ENTANGLEMENT.**

The First Amendment directs all government bodies to "make no law respecting the establishment of religion." United States Constitution, First Amendment. While the Supreme Court's precedent regarding the Establishment Clause has sent mixed signals as to what the proper standard includes, *Weinbaum v. City of Las Cruces* determined that in the 10th Circuit, the proper standard is the "tripartite test set out in *Lemon*." 541 F.3d

6

1017 (10th Cir., 2008).   To pass muster under the Establishment Clause, *Lemon v.*

*Kurtzman* requires that state action have (1) "a secular purpose," (2) a "primary effect"

that "neither advances nor inhibits religion, and (3) no tendency to foster "an excessive

government entanglement with religion."[1]   403 U.S. 602, 612-613 (1971).   The Shariah

Ban transgresses the Establishment Clause if it "violates any part of this analysis."[2]   *Utah*

*Gospel Mission v. Salt Lake City Corp.,* 425 F. 3d 1249, 1259 (Fed. 10th Cir., 2005).

A.   The Creators of the Shariah Ban Have Disclosed its Unlawfully Sectarian Purpose

Because the Shariah Ban's origins establish that the amendment's "actual purpose

is to…disapprove" of Plaintiff's faith, it lacks the secular purpose *Lemon* requires.[3]   In

*Utah Gospel Mission v. Salt Lake City Corp,* the Court determined that an inquiry into

the actual government purpose of a challenged measure places upon the Court a duty…to

"'distinguish a sham secular purpose from a sincere one.'" 425 F. 3d at 1259.   Thus, it is

appropriate to consider the stated "secular justification" to determine whether it is either

illusory or "secondary to a religious purpose" and therefore invalid under the

Establishment Clause.   *American Atheists Inc v. Duncan* (10th Cir., 2010)

In the present matter, however, this Court need not conduct a probing inquiry to

reveal the purpose of the Shariah Ban.   This is because the measure's architects have not

asserted a secular purpose.   Instead, the authors of the Shariah Ban identified repeatedly

in print and on video a sectarian purpose.

---

[1] Lemon v. Kurtzman Earley, 403 U.S. 602, 612-613 (1971)
[2] Utah Gospel Mission v. Salt Lake City Corp., 425 F. 3d 1249, 1259 (Fed. 10th Cir., 2005)
[3] Utah Gospel Mission v. Salt Lake City Corp., 425 F. 3d 1249, 1259 (Fed. 10th Cir., 2005)

Representative Rex Duncan, the House author of the Shariah Ban, announced on television that "America was founded on Judeo-Christian principles" and the Shariah Ban's purpose was to ensure that Oklahoma's courts are not used to "undermine those founding principles." He characterized the conflict he perceives between America's Judeo-Christian principles and the Islamic traditions embodied in Shariah Law as a "cultural war, a social war, a war for the survival of our country." *Id.* Representative Duncan stated that the Shariah Ban's purpose was to effect a "preemptive strike" against the "growing threat" of Shariah Law in the midst of the conflict he perceives.[4] *Id.*

The Shariah Ban's chief author explained in print that the purpose of the measure was to establish a legal impediment against the "looming threat" of Shariah Law in the United States.[5] Branson-Potts, Hailey. State Question 755 Would Make Sure Future Courts Aren't Able to Use Sharia Law When Deciding Cases, Oklahoma Gazette (October 6, 2010) www.okgazette.com. When a reporter asked Representative Duncan if a judge in Oklahoma ever considered Shariah Law, he gave the following reply: "No…and we want to make sure they never will." Kennedy, Douglas. Shariah (Islamic Law) Not O.K. in Oklahoma. June 25, 2010. www.liveshots.blogs.foxnews.com. These comments indicate that the Shariah Ban's purpose was the antithesis of something secular. Representative Duncan's intent in crafting the Shariah Ban was to attach to Plaintiff's faith a profound stigma that would relegate Plaintiff to an ineffectual position within the political community.

---

[4] Accessed and viewed at http://www.youtube.com/watch?v=-LxwPN-2pYw&feature=related, msnbc

A co-author of the Shariah Ban, Representative Lewis Moore, identified the measure's purpose in similar terms. Oklahoma needs the Shariah Ban, reasoned Representative Moore, because of the "onslaught" of Shariah Law that he expects Oklahoma to soon face.[6] Schlachtenhaufen, Mark. Sharia Law, Courts Likely on 2010 Ballet. The Edmund Sun (June 4, 2010) www.edmondsun.com. Like Representative Duncan, Representative Moore concedes that the purpose of the Shariah Ban is not secular. Its purpose is to inhibit, frustrate, and burden the Islamic faith that both Representative Duncan and Moore seem to fear.

Senator Anthony Sykes, an additional co-author of the Shariah Ban, provided his own admission that the purpose of the Shariah Ban was not secular. Senator Sykes stated that the purpose of the Shariah Ban was "to make it crystal clear that [Shariah Law is] not to be considered in Oklahoma."[7] Ure, Laurie, Oklahoma Voters Face Question on Islamic Law. CNN (November 1, 2010) www.edition.cnn.com. Again, the declared purpose is wedded to the religious tradition to which Shariah Law refers rather than some secular matter that overlaps.

Because the Shariah Ban's purpose, as the measure's co-authors have publicly conceded, is to stigmatize, denigrate, and segregate Plaintiff's faith in the public's mind

---

as something foreign and to be feared, it lacks the secular purpose the Establishment Clause requires.

B.    The Shariah Ban Denigrates Plaintiff's Standing in the Political Community by Transforming Oklahoma's Constitution into an Enduring Condemnation of Plaintiff's Faith

To avoid having the effect of advancing or inhibiting religion, the Shariah Ban must maintain "government neutrality between religion and religion, and between religion and non-religion." *American Atheists Inc v. Duncan* (10th Cir., 2010). The measure cannot "make adherence to a religion relevant in any way to a person's standing in the political community." *Id.* If the Shariah Ban, however, has the "effect of communicating government endorsement or disapproval" of Plaintiff's faith, then the amendment would establish an unconstitutional linkage between adherence to a particular religion and standing in the political community. *Id.*

Because the Shariah Ban conveys to the public that Oklahoma "favors" a "religious belief" other than Plaintiff's own faith, the measure has as its effect the inhibition of Plaintiff's religion. The Shariah Ban singles out Plaintiff's faith but no other for special restrictions.    The Shariah Ban directs Oklahoma's state courts to "not consider…Shariah Law," which encompasses both the Quran and Islam's prophetic traditions, in any of its proceedings irrespective of its relevance to a controversy. *See* State Question 755's Amended Text for Article 7, Section 1, Oklahoma Constitution.    It also directs courts to refrain from adhering to another state's otherwise applicable law if it "include[s] Shariah Law." *Id.*

10

What is so striking about these extraordinary restrictions is that the Shariah Ban attaches them while maintaining a willful blindness to the specific content of Plaintiff's faith.   The Shariah Ban places its restrictions onto any practice originating from Plaintiff's faith because the source of the religious practice *is* Plaintiff's faith.   This creates the reprehensible possibility of a court, confronted with two effectively identical wills, probating one but not the other because one refers to provisions of "Shariah Law" to establish inheritance shares while the other refers to another religious tradition to establish the exact same inheritance shares.   The Shariah Ban's disparate treatment of these two wills telegraphs state disapproval of Plaintiff's faith.   Thus, the Shariah Ban impermissibly inhibits Plaintiff's faith insofar as it establishes an unconstitutional linkage between Plaintiff's faith and his standing in the political community.

C.    The Shariah Ban Impermissibly Directs Oklahoma's State Courts to Take Positions on Doctrinal Matters Regarding Plaintiff's Faith

Because the Shariah Ban directs Oklahoma's state courts to make "intrusive judgments regarding contested questions of religious belief or practice," the measure excessively entangles Oklahoma in Plaintiff's faith.[8] *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1261 (10th Cir., 2008).   The Shariah Ban forbids courts from considering Shariah Law in any of its proceedings.   To execute this directive, however, Oklahoma's state courts must determine what is and what is not Shariah Law.   There is no single religious text that all Muslims accept as the exclusive source for what the

_____

Shariah Ban calls "Shariah Law." Thus, Oklahoma state courts would have to develop judiciable standards for delineating the content of Shariah Law.

The Supreme Court has long held that inquiries of this kind violate the Establishment Clause. *Mitchell v. Helms* directed courts to "refrain from trolling through a person's or institution's religious beliefs."[9]   530 U.S. 793 at 828,(2000). *NLRB v. Catholic Bishop of Chicago* went even further, declaring that when a court begins an inquiry regarding religious doctrine, "it is not only the conclusions" that the court may reach but also "the very process of inquiry" deployed to reach those conclusions that violate the Establishment Clause. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). Indeed, *Salazar v. Buono* recently confirmed that the Establishment Clause "at the very least prohibits government from appearing to take a position on questions of religious belief."[10] *Salazar v. Buono*, No. 08-472 (2010). If *Buono* found the appearance of taking a position on questions of religious belief constitutionally invalid, then the development of judiciable standards delineating the definition of "Shariah Law" that necessarily follows the application of the Shariah Ban is surely unconstitutional as well. Thus, for state courts to exclude from consideration all Shariah Law, Oklahoma must become excessively entangled in Plaintiff's faith in violation of the Establishment Clause. This alone renders the Shariah Ban unconstitutional.

_____

## II. BECAUSE THE SHARIAH BAN DELIBERATELY SUPRESSES CONDUCT PROTECTED BY THE FREE EXERCISE CLAUSE, THE MEASURE MUST SURVIVE STRICT SCRUTINY.

At the core of the free exercise clause is the guarantee that "government may not enact laws [in order to] suppress religious…practice."[11] *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). The Shariah Ban would violate this "fundamental non-persecution principle" if it "regulates or prohibits conduct because it is undertaken for religious reasons."[12] *Id.* To outweigh such "legitimate claims to the free exercise of religion," the government must demonstrate that its law advances "only those interests of the highest order and those not [able to be] otherwise served."[13] *Wisoncsin v. Yoder*, 406 U.S. 205, 215 (1972). In other words, a law that targets a particular religious practice "because of its religious motivation," comports with the First Amendment only if it serves a "compelling governmental interest" and is "narrowly tailored to advance that interest."[14] *Lukumi* 508 U.S. 520. Because the Shariah ban is an example of a law that burdens only conduct motivated by a disfavored religion, it must survive this heightened level of scrutiny.

A.   The Text of the Shariah Ban Discriminates Against Plaintiff's Faith on its Face

_____

The Shariah ban targets Plaintiff's religious conduct because a currently disliked religious tradition inspired it. *Lukumi* demonstrates that, because the Shariah ban "discriminate[s] on its face" and encumbers only Plaintiff's religious practices while exempting all others, the ban targets conduct only when it is grounded in Plaintiff's disfavored faith. *Id.* In *Lukumi,* a municipality established a citywide ban on animal sacrifice, sculpting a statutory infrastructure that circumscribed one unpopular religious practice and left unaffected all other conduct. *Id.* This ban came in response to the formation of a community of adherents to the Santeria religion, a faith that features animal sacrifice prominently among its rituals, within the municipality. *Id.* After establishing the ban the city then issued a series of exemptions that shielded favored establishments from the ban. *Id.* The ban also excluded conduct that otherwise would amount to animal sacrifice if the conduct was performed for the "primary purpose" of producing food. *Id.* But the city clarified that this exemption was not available to groups like adherents to the Santeria religion, that generally engage in animal sacrifice. *Id.*

*Lukumi* found that a law's text alone may justify the application of heightened scrutiny if the text furnishes evidence sufficient to conclude that the law is not neutral and has as its primary object the "suppression of…religious conduct." *Id.* "[F]acial neutrality," held *Lukumi*, is the absolute "minimum requirement of neutrality." *Id.* The Court determined that a law's text is not neutral if it makes reference to a religious practice but lacks a corresponding "secular meaning discernable from the language or context." *Id.* Indeed, *Lukumi* emphasized that the mere presence of words having

"strong religious connotations" within the law's text was both "support[ive]" and "consistent" with the conclusion that the law is not neutral and therefore subject to heightened scrutiny. *Id.*

To a greater extent than the statutory language at issue in *Lukumi*, the Shariah Ban makes no colorable gesture at facial neutrality, because it uses language unequivocally and exclusively wedded to Plaintiff's faith. The amendment to Oklahoma's constitution that the Shariah Ban effects makes two independent references to "Shariah Law." First, the Shariah ban's constitutional language directs state courts to "uphold and adhere to" the law of other states, when appropriate, only if that law "does not include Shariah Law." And second, the Shariah ban directs state courts to "not consider…Shariah Law" as a general matter, which would apply a constant substantive constraint upon Oklahoma's state courts for the period in which the courts maintain jurisdiction. These references to "Shariah Law" lack a corresponding "secular meaning" through which the Shariah ban could satisfy the facial neutrality standard *Lukumi* established. On its face, the Shariah ban proclaims proudly its intent to treat differently the millennium's worth of collected Islamic religious practices that "Shariah Law" encompasses.

Indeed, the ballot presented the Shariah ban to voters as a constitutional amendment that would prevent Plaintiff and other adherents to his faith from admitting for judicial consideration evidence regarding Islamic religious practice. The ballot describes Shariah Law as "Islamic Law" based on the "Koran and the teaching of Mohammed." These two sources delineate the spiritual foundation of Plaintiff's faith.

Thus, there is no plausible "secular meaning" that corresponds to the content "Shariah Law" identifies.  Because the Shariah ban is not facially neutral, this Court must subject the ban to heightened scrutiny.

B.      The Shariah Ban's Legal Mechanisms Impermissibly Burden Plaintiff's Conduct Because it is Grounded in Plaintiff's Faith

Looking beyond the Shariah ban's text, *Lukumi* demonstrates that the "effect of a law in its real operation" provides another means of determining whether impermissible religious suppression is the law's object.  In *Lukumi,* because the law contained exceptions and caveats that left only an unpopular religious practice subject to the law's force, the Court determined that the unpopular religious practice was the "exclusive legislative concern."  So too, here, the Shariah ban burdens adherents of no other religion with the inability to admit evidence pertaining to religious practice into state court in a context where such evidence would otherwise be relevant.

In the present matter, the Shariah ban prevents Plaintiff's will from being fully probated by a state court in Oklahoma, because it incorporates by reference specific elements of the Islamic prophetic  traditions.  The Shariah ban, however prevents state courts from "considering…Shariah Law" which even the most modest interpretation of the clause would include the Islamic prophetic traditions to which Plaintiff refers. Therefore, Plaintiff is unable to rely on a court to incorporate the religious documents that express his faith into his will.  Had Plaintiff referenced documents associated with the Christian tradition or Judaic law, the Shariah ban would not frustrate Plaintiff's interest in having his will fully probated .  Plaintiff, however, referred to documents that

the Shariah ban identifies as "Shariah Law." And this is the reason why a court, applying the Shariah ban, will not enforce the contents of his will.

First Amendment jurisprudence has consistently struck down laws that, like the Shariah ban, allocate special burdens based on a person's association with a disfavored faith. *Niemotko v. State of Maryland Kelley* held that a government cannot place burdens upon persons it has a "dislike for or disagreement with" an individual's or group's faith. 340 U.S. 268, 272 (1951). In *Employment Division, Department of Human Resources of Oregon v. Smith*, the Court noted that the First Amendment "obviously excludes" any state action that "impose[s] special disabilities on the basis of religious views or religious status." *Fowler v. State of Rhode Island* determined that a state policy that "treat[s] differently" one faith from another amounts to impermissibly "preferring some religious groups" over others. 345 U.S. 67, 69 (1953). The Shariah Ban falls comfortably within this line of cases insofar as it imposes constraints on conduct because of its religious motivation. Therefore, to satisfy the Free Exercise Clause, the Shariah Ban must demonstrate that the measure is narrowly tailored to a compelling state interest.

C.      The Shariah Ban is Not Narrowly Tailored to a Compelling Interest

Because the Shariah Ban burdens conduct due to its "religious motivation," the measure is unconstitutional unless it can establish that it is "narrowly tailored" to advance a "compelling interest." *Larson v. Valente,* 456 U.S. 228 (1982). In this case, because the Shariah Ban was a state question, there is not an extensive legislative record that this Court can use to identify the interest served. The predicament of determining what

interest the Shariah Ban actually serves, however, is irrelevant because whatever the purported interest and whether or not it is compelling, the Shariah Ban is not narrowly tailored to advancing it.

The structure of the Shariah Ban is far too broad to be narrowly tailored to any interest.   The Shariah Ban prevents persons from presenting and state courts from considering "Shariah Law."   Because the Shariah Ban is absolute, the measure acts to exclude each and every proposition that belongs to the religious tradition to which Shariah law refers.   This includes innumerable provisions regarding every conceivable aspect of human life.   Some may contradict U.S. law, others may correspond to U.S. law, and yet others still impose religious duties that do not contradict U.S. law.   The Shariah Ban makes no effort to distinguish between these different groups.   Furthermore, the Shariah Ban would prevent courts from considering even a proposition of Shariah law substantively identical to a proposition grounded in another religious tradition.   Given the sweeping breadth of the Shariah Ban, whatever the purported interest, the measure is not narrowly tailored to advance it.

## III.   BECAUSE THE SHARIAH BAN IS MOTIVATED BY A DESIRE TO HARM ADHERENTS TO PLAINTIFF'S FAITH, THE MEASURE LACKS THE LEGITIMATE INTEREST IT NEEDS TO SURVIVE RATIONAL BASIS REVIEW

In the event that this Court determines rational basis review to the proper standard of review, to pass constitutional muster, the Shariah Ban must be "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440

(1985). The standard entrusts this Court with the responsibility to "insist on knowing"
that relationship, empowering it to reject proffered legislative justifications that are
"impossible to credit." *Romer v. Evans*, 517 U.S. 620, 632 (1985). And because
Muslims comprise a class "characterized by [an] unpopular trait," namely their adherence
to Islam, the burden the Shariah Ban places on them reflects a "special likelihood of bias
on the part of the ruling majority" that the Court may review closely. *New York City
Transit Authority v. Beazer*, 440 U.S. 568, 593 (1979). If this judicial inquiry uncovers a
"bare congressional desire to harm a politically unpopular group," this Court must reject
it. *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Thus, rational
review empowers this Court to strike down the Shariah Ban if it finds that the measure is
motivated by the "purpose of disadvantaging the group burdened." *Romer*, 517 U.S. at
633.

The government may argue that the Shariah ban's encumbrance on Plaintiff's
religious practice is "merely the incidental effect of a generally applicable and otherwise
valid provision." *Employment Division, Department of Human Resources of Oregon v.
Smith*, 494 U.S. 872, 878 (1990). The Shariah Ban, the government may argue, also
prevents courts from considering "international law" as well as the "legal precepts of
other nations or cultures." State Question 755's Amended Text for Article 7, Section 1,
Oklahoma Constitution. The government may assert, then, that the Shariah Ban excludes
all law it deems foreign irrespective of its source. Thus, the enumeration of Shariah Law
by name in the text is illustrative of the comprehensive ban on the consideration of

foreign law that the Shariah Ban seeks to effect. Therefore, any burden imposed upon Plaintiff is permissible because the burden is merely the "incidental effect" of a "generally applicable" provision.

This argument, however, is not plausible, because a restriction of a generally applicable law would burden conduct irrespective of its motivations. The Shariah Ban does not identify conduct. Instead, it identifies and then excludes an entire religious tradition from the cognizance of Oklahoma's state courts. The Shariah Ban targets conduct whenever that conduct emanates from the religious tradition to which Shariah Law refers. Thus, the Shariah Ban applies to the actions Plaintiff takes in accordance with his faith while identical actions absent a connection to Plaintiff's faith taken by another are beyond the scope of the Shariah Ban.

Indeed, the only interest consistent with both the language and operation of the Sharia Ban is an interest in harming an unpopular minority. The absolute ban on courts considering the religious traditions to which Shariah Law refers without mention of other religious traditions is consistent with a desire to express official condemnation of Islam and stigmatize its adherents. This explains the absence of a mechanism to divine the contents of specific propositions of Shariah Law. It also explains why the Shariah Ban mentioned no other religious tradition. The goal was to stigmatize Islam by establishing in the public's mind that Islam is something foreign and to be feared. However, this interest—a "desire to harm a politically unpopular group"— is not a "legitimate

governmental interest." *Romer*, 517 U.S. at 633. Thus, the Shariah Ban, lacking a legitimate governmental interest, cannot survive even rational basis review.

**(2)  Plaintiff Will Suffer Irreparable Harm Absent A Temporary Restraining Order**

Because Plaintiff will suffer the "loss of First Amendment freedoms" at the moment Defendants certify the Shariah Ban's election results, *Elrod v. Burns* indicates that such deprivations of First Amendment rights "unquestionably constitute[] irreparable injury."   427 U.S. 347, 373 (1976).   Thus, Plaintiff must demonstrate only that the certification of the Shariah Ban's election results denies him his rights under the Establishment and Free Exercise Clauses of the First Amendment.

The Shariah Ban denies Plaintiff his Establishment Clause right to a state government that does not "officially prefer" other faiths over his own. 427 U.S. 347, 373 (1976).  As discussed in the merits section above, the Shariah Ban has the purpose and effect of condemning Plaintiff's faith and enshrining that condemnation in Oklahoma's constitution.  The Shariah Ban positions the state courts to issue determinations that tell Plaintiff what content is included in his religious tradition and what content is not.  All of these consequences brought about by the Shariah Ban infringe upon Plaintiff's rights under the Establishment Clause.

The injury that Plaintiff suffers is not economic.  And when the Establishment Clause is implicated, *US v. SCRAP* held that injury is "not confined to those who could show economic harm." 412 U.S. 669, 686 (1973).  Noneconomic interests, including but not limited to "aesthetic and environmental" deprivations, are injuries. *Id.*  Indeed, even

"a spiritual stake in First Amendment values" denigrated and offended by state action can result in an Establishment Clause injury.  *Association of Data Processing Service Organizations, Inc v. Camp*, 397 U.S. 150, 154

Here, Plaintiff's injury is clear.  When Defendants certify that the Shariah Ban received a "majority of all the electors" that cast a vote on the amendment, the Shariah Ban "shall thereby become a part" of Oklahoma's Constitution.  Section XXIV-1.  At that moment, Plaintiff will be subjected to the stigma and embarrassment of having his home state isolate his faith for public censure.  Plaintiff will have acquired the knowledge that his state "officially prefers" other faiths over his own and, by enshrining that preference into the constitution, has created a mechanism of permanently broadcasting this message to Plaintiff's neighbors and his community of the preference.  *Larson v. Valente,* 456 U.S. 228, 244 (1982).  It is precisely this type of injury, which Plaintiff will suffer without a temporary restraining order, that the Establishment Clause does not tolerate.

Furthermore, Plaintiff will suffer a deprivation of his right to the free exercise of his faith insofar as the Shariah Ban will prevent his last will and testament from being probated in its entirety and executed in accordance with his wishes.  Plaintiff's will directs the executor of his estate to prepare his deceased body in accordance with the prophetic tradition "enumerated in Sahih Bukhari, Volume 2, Book 23, Number 345," ensure that the burial plot selected permits Plaintiff's body "to be interned with [his] head pointed in the direction of Mecca, and organize funeral prayers "in accordance with Sahih Al-Bukhari, Chapter 28, Section LIII, Number 1255 and the first paragraph of Section

22

LV." Plaintiff also directs his wife to contribute to charity in accordance with Sahih Bukhari, Volume 4, Book 51, Number 7. All of these references to Islam's prophetic traditions are benign rituals that comport with existing law. The Shariah Ban, however, would consider the references to be "Shariah Law" and thus refuse to execute the will in the way Plaintiff believes best reflects his faith.

Whereas, now, before the Shariah Ban becomes a part of Oklahoma's constitution on the ninth of November, a court would simply apply the common law doctrine of incorporation by reference to determine if the referenced document was "in existence when the will [was] executed and "show[s] testator's intention to incorporate the instrument into his will" *Miller v. First Nat. Bank & Trust Co.*, 637 P.2d 75 (Okla., 1981). If these two prongs were met, the references that Plaintiff makes to his faith's prophetic tradition would be treated as if they were a part of his will. *Id.* However, if Defendants certify the Shariah Ban's election results, a court could no longer incorporate the references that Plaintiff makes, because to do so would require the court to "consider Shariah Law." Thus, if the Shariah Ban becomes a part of Oklahoma's constitution, Plaintiff's will, which he executed as an exercise of his faith, cannot be enacted in the manner he selected. The Shariah Ban will injure Plaintiff by depriving him of the free exercise of his religion in the domain of his last will and testament.

### (3)The Equities Favors Plaintiff, because Delay Causes Defendants no Harm

The certainty of irreparable harm to Plaintiff's First Amendment rights outweighs the inconvenience, at most, Defendants must bear by refraining from certifying the

election results of the Shariah Ban pending the outcome of this case.  A temporary restraining order or a preliminary injunction would not prohibit Defendant's from tabulating election results or certifying the outcomes in races for elected office or other state questions.  Indeed, Defendants would still be able to perform the due diligence functions as they pertain to the Shariah Ban.  Preliminary relief would order that Defendants refrain from taking the only final, legally effective step of certifying the vote totals regarding the Shariah Ban.

Furthermore, if this Court withholds preliminary relief now, even a final order in Plaintiff's favor later would not prevent the Shariah Ban from staying a part of Oklahoma's constitution during years of appeals.  Thus, the only mechanism for preventing years of irreparable injury to Plaintiff is to issue a temporary restraining order and preliminary injunction pending the outcome of this case.

### (4) Preliminary Relief is in the Public Interest as it Vindicates Plaintiff's Rights

While voters approved the Shariah Ban by a wide margin, this alone is not determinative of the public interest.  The public has a more profound and long-term interest in upholding Plaintiff's constitutional rights.  When Plaintiff's rights are upheld, others may avail themselves of the freedoms made more robust.

Courts have repeatedly found the vindication of constitutional rights to be in the public interest. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 362 (1981) ("The public certainly has an interest in the judiciary intervening when prisoners raise allegations of

constitutional violations."); *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (holding that a preliminary injunction was not contrary to the public interest because "it will protect the free expression of the millions of Internet users both within and outside of the State of New Mexico."); *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997) ("The public interest also favors plaintiffs' assertion of their First Amendment rights."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to protect the violation of a party's constitutional rights."). Because a temporary restraining order and a preliminary injunction will protect Plaintiff against the violation of his First Amendment Rights that the Shariah Ban will effect, preliminary relief is in the public interest.

PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff requests that the Court in the proposed form submitted by Plaintiff, schedule a hearing on Plaintiff's request for a preliminary injunction at the earliest possible date, and after that hearing, enter a preliminary injunction in the form proposed by Plaintiff.

Respectfully submitted,

By: _____

Muneer Awad, 405-415-6851

101 NE 53rd Street, #3514

Oklahoma City, OK 73105

25