IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| MUNEER AWAD, | ) | Case No. CIV-10-1186-M |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| PAUL ZIRIAX, *et al.* | ) |  |
|  | ) |  |
| Defendants. | ) |  |

*AMICUS CURIAE* BRIEF OF
UNITED STATES BORDER CONTROL,
UNITED STATES BORDER CONTROL FOUNDATION,
LINCOLN INSTITUTE FOR RESEARCH AND EDUCATION, AND
CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND
IN OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

Of Counsel:
HERBERT W. TITUS
WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
WILLIAM J. OLSON, P.C.
370 Maple Avenue West
Suite 4
Vienna, VA  22180-5615
(703) 356-5070

KEVIN CALVEY* (Bar No. 16190)
4244 Cherry Hill Lane
Oklahoma City, OK  73120
(405) 808-0041
kevincalvey@gmail.com

*Counsel of Record*
*Attorneys for Amici Curiae*

November 16, 2010

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTEREST OF THE AMICI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    THE PLAINTIFF HAS NO STANDING TO BRING THIS CASE. . . . . . . . . . . . 2

II.   PLAINTIFF HAS FAILED TO MEET THE FOUR-PART TEST REQUIRED TO
      SUPPORT A PRELIMINARY INJUNCTION. . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Plaintiff Is Not Likely to Succeed on the Merits. . . . . . . . . . . . . . . . . . . 8

      B.    Plaintiff Will Not Suffer Irreparable Harm. . . . . . . . . . . . . . . . . . . 15

      C.    The Balance of the Equities Is Against the Plaintiff. . . . . . . . . . . . . . . . 16

      D.    The Public Interest Favors Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ii

**TABLE OF AUTHORITIES**

**U.S. Constitution**

Article III, Section 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

First Amendment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9, 13, 15


**Cases**

Allen v. Wright, 468 U.S. 737 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). . . . . . . . . . 13

Elrod v. Burns, 427 U.S. 347 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952). . . . . . . . . . . . . . . . . . . . . . . . 13

Kikimura v. Hurley, 242 F.3d 950 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kreshik v. St. Nicholas Cathedral, 363 U.S. 190 (1960). . . . . . . . . . . . . . . . . . . . . . . 13

Lemon v. Kurtzman, 403 U.S. 602 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Reynolds v. United States, 98 U.S. 145 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

S.D. v. M.J.R. 415 N.J. Super. 417 (Sup. Ct., Aplt. Div., 2010). . . . . . . . . . . . 10, 11, 12

Valley Forge College v. Americans United for Separation of Church and State, 454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Watson v. Jones, 80 U.S. 679 (1872). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Winsness v. Yocom, 433 F.3d 727 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 5


**Miscellaneous**

74 *Opinions of the Maryland Attorney General* 19 (1989). . . . . . . . . . . . . . . . . . . . . . 17

iii

Center for Security Policy, <u>Shariah: The Threat to America</u> (2010). . . . . . . . . . . . . . . . 15

Maxim Lott,  "Advocates of Anti-Shariah Measures Alarmed by Judge's Ruling,"
FoxNews.com, August 5, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

"Talaq uttered by Muslim man on cellphone valid," <u>The Times of India</u>,
November 15, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTEREST OF THE AMICI

The *amici curiae,* U.S. Border Control, U.S. Border Control Foundation, The Lincoln Institute for Research and Education, and Conservative Legal Defense and Education Fund, are nonprofit organizations having mutual interests in public education, proper construction of the Constitution and laws of the United States, and limited government.

These *amici* have a common interest in the matters raised in this litigation, and are mutually concerned about the legality of an injunction against certifying the Oklahoma constitutional amendment recently voted by the citizens of Oklahoma, when they approved State Question 755, amending Article 7, Section 1, of the Oklahoma Constitution. These *amici curiae* believe that the plaintiff lacks standing to seek the requested relief, that he has presented no case or controversy which would confer standing under Article III of the U.S. Constitution, and that he does not meet the standards for granting injunctive relief. These *amici* believe that their Brief, which supports the defendants' position in this litigation, will be of assistance to this Court in fully appreciating the scope of the issues presented.

## BACKGROUND

On November 2, 2010, the people of Oklahoma overwhelmingly approved State Question 755 which amends Article 7, Section 1, of the Oklahoma Constitution, instructing the state's courts "when exercising their judicial authority" to:

> uphold and adhere to the law as provided in the United States Constitution, the Oklahoma Constitution, the United States Code, federal regulations promulgated pursuant thereto, established common law, the Oklahoma Statutes, and rules promulgated thereto, and if necessary, the law of another state of the United States, provided the law of the other state does not include **Sharia law**, in making judicial decisions.  The courts shall not look to

2

> the legal precepts of **other nations or cultures**.  Specifically, the
> courts shall not consider **international law** or **Sharia law**.
> [Emphasis added.]

As such, this constitutional amendment restrains state courts from either deferring to or applying either (i) international law or (ii) Sharia law.

On November 4, 2010, plaintiff, a self-described "practicing Muslim," filed a Complaint *pro se,* accompanied by a Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("Memo in Support"), seeking a temporary restraining order and preliminary injunction against the agency head and the three members of the Oklahoma State Board of Elections to prevent the board from certifying the passage of State Question 755.

On November 8, 2010, the Court conducted a hearing on plaintiff's request for a temporary restraining order, at which both plaintiff and counsel for defendants were heard.

On November 9, 2010, the Court entered a temporary restraining order, enjoining defendants from certifying the election results for State Question 755, and set a briefing schedule (with the government's brief due at noon on November 16, 2010, and the plaintiff's brief due by 9:00 am on November 19, 2010) as well as a hearing on plaintiff's request for a preliminary injunction for 10 a.m., November 22, 2010.

3

**ARGUMENT**

## I.    THE PLAINTIFF HAS NO STANDING TO BRING THIS CASE.

It is well-established that this Court has jurisdiction only if there is a "case or controversy," as provided in Article III, Section 2 of the United States Constitution.  *See* <u>Allen</u> v. <u>Wright</u>, 468 U.S. 737 (1984).  As this Court observed in its Temporary Restraining Order, "an essential part of the case-or-controversy requirement is … that a plaintiff must have standing."  Temporary Restraining Order ("Order"), p. 2.  And, as this Court further observed, the rule on standing in the Tenth Circuit is as follows:

> A party has standing to pursue a claim in federal court **only if:** (1) it suffered an "injury in fact" — an invasion of a **legally protected** interest which is (a) concrete and particularized, and (b) actual or imminent, **not** conjectural or hypothetical; (2) that injury is fairly traceable to the challenged action of the defendant rather than some third party not before the court; and (3) that injury is likely to be redressed by a favorable decision.  *Hydro Res., Inc. v. United States Envtl. Prot. Agency*, 608 F.3d 1131, 1144 (10th Cir. 2010).  [Order, pp. 2-3 (emphasis added).]

While this Court has previously found "that plaintiff has standing to bring the instant action," these *amici curiae* would urge the Court to reconsider that holding.  As the Order states, this Court based its ruling on "plaintiff's complaint and memorandum," and "arguments presented at the [November 8, 2010] hearing."  Neither the plaintiff's complaint nor his memorandum in support specifically addressed the standing issue.  Prior to the entry of the Order, defendants had not submitted a written memorandum addressed to the issue.  With certification of the passage of State Question 755 scheduled for November 9, 2010 — just a day after the hearing — this Court had precious little time to give any more than cursory

4

treatment of the three-pronged standing rule that must be satisfied before this Court exercises its jurisdiction to enjoin temporarily the state board's action.

As the Supreme Court emphasized in <u>Valley Forge College</u> v. <u>Americans United for Separation of Church and State</u>, 454 U.S. 464 (1982), standing must not be lightly assumed, nor is standing satisfied by an artfully phrased complaint. *Id.*, 454 U.S. at 471.  Rather, "[t]he power to declare the rights of individuals and to measure the authority of governments … 'is legitimate only in the **last resort**, and as a **necessity** in the determination of **real, earnest and vital controversy**.'" *Id.* (emphasis added).  In contrast, plaintiff filed this lawsuit as a **first resort** — just two days after the November election — unsupported by any sworn affidavits or declarations attesting any **necessity** warranting action by this Court to enjoin the certification of an election result.  We would submit, then, that before the Court takes any further action in this case, it revisit the question of standing.

According to this Court's Order, "plaintiff has made a **preliminary** showing that he will suffer an injury in fact."  Order, p. 3 (emphasis added).  But that preliminary showing was not based upon any evidence.  Rather, as the Order states, the finding was based upon allegations in the complaint and arguments submitted in a written memorandum and presented at a hearing.  Indeed, the plaintiff's allegations and arguments demonstrate that, instead of making a showing of "concrete and particularized" facts, plaintiff's complaint and memorandum contain mostly generalized conjecture, unsupported by any sworn testimony:

- "Once the Shariah Ban becomes a part of Oklahoma's constitution, Plaintiff will suffer **official disapproval** of his faith …."  (Complaint, ¶ 19 (emphasis added).)

5

- "The Shariah Ban … will imply to Oklahomans that there is something especially nefarious about the Koran …." (*Id.*, ¶ 20.)

- "[T]he Shariah Ban [has] the illicit effect of discrediting Plaintiff's faith." (*Id.*, ¶ 21.)

- "[T]here will be no escape from the stigma his community now reflexively associates with [Plaintiff]." (Memo in Support, p. 2.)

- "Surely, people will whisper, there must be something deeply threatening about [Plaintiff's] faith." (*Id.*)

- "[Plaintiff] anticipates that official disapproval of his faith will result in a stigma attaching to his person." (*Id.*, p. 5.)

- "Plaintiff will be subjected to the stigma and embarrassment of having his home state isolate his faith for public censure." (*Id.,* p. 22.)

None of these allegations is sufficient to confer standing.  As the Court of Appeals for

the Tenth Circuit recently ruled:

> The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct….
> [<u>Winsness</u> v. <u>Yocom</u>, 433 F.3d 727, 732 (10th Cir. 2006).]

In an effort to make these generalized grievances more concrete and particularized,

plaintiff has alleged two counts in his Complaint, but neither count suffices to satisfy the

standing requirement.

Count I alleges that, if the defendants certify that State Question 755 has been passed,

plaintiff personally will suffer "official disapproval of his faith" and the "discrediting [of his]

faith."  ¶¶ 19, 21.  The count does not support a finding of standing because plaintiff's claim

rests upon the erroneous assumption that the constitutional amendment is tantamount to a

personal attack on his Muslim faith.  *See* Complaint, ¶¶ 15, 20.  The amendment does not

6

target plaintiff's faith.  First of all, it addresses "Sharia Law," not the "Muslim faith."  And for good reason.  The amendment concerns the exercise of state judicial power, not the exercise of one's religious faith.  Second, while the amendment does mention "Sharia Law" by name, it is not limited to a disapproval of Sharia law as a basis for the exercise of judicial power.  Rather, the amendment prohibits the exercise of the state judicial power according "to the **legal precepts** of other nations and **cultures**."  (Emphasis added.)  It also disallows the use of "international law" in the same sentence and for the same reasons as it disallows the use of "Sharia law."

The amendment affirms the long-standing American tradition that the law in the United States does not depend upon the identity of the parties, their national heritage, their religious background, or the culture of their countries of origin.  Rather, the exercise of judicial power is governed by the law of the land — this land.  In <u>Reynolds</u> v. <u>United States</u>, 98 U.S. 145, 161 (1878), the Supreme Court rejected the claim that since Mormon teachings established that "it was the duty of male members of [the Mormon Church], circumstances permitting, to practice polygamy," the Free Exercise Clause of the First Amendment prevented the prosecution of a Mormon man for such an offense.  The Court explained:

> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.…  [A]s **a law of the organization of society** … it is provided that plural marriages shall not be allowed.  Can a man excuse his practices to the contrary because of his **religious belief**?  [T]this would be to make the professed doctrines of **religious belief** superior to the **law of the land,** and in effect to permit every citizen to become a **law unto himself**.  Government could exist only in name under such circumstances.  [*Id.* at 166-67 (emphasis added).]

Contrary to plaintiff's allegation that the amendment has a "sectarian purpose" — the "discrediting [of] Plaintiff's faith" — the amendment has a secular purpose, that is, to reaffirm the state's commitment that the law will be administered uniformly as to persons within its territory.

Plaintiff's allegations in Count II also fall short of demonstrating that he has standing. In Count II, plaintiff speculates that a court probating his will would be unable to do so because many provisions of his last will and testament are based on "the teaching of Mohammed" which, in turn, would require the "consider[ation] … [of] Shariah Law." *See* Complaint, ¶¶ 24-26. Plaintiff is mistaken. In an effort to make his injury appear more "concrete and particularized," plaintiff goes to great lengths to demonstrate that the amendment "will prevent his last will and testament from being probated in its entirety and executed in accordance with his wishes." Memo in Support, p. 22. But the injury claimed is neither "actual nor imminent." Plaintiff is very much alive. Not only is there no probate proceeding "imminent," but the future injury that plaintiff anticipates is not "actual." Plaintiff concedes that under the current common law rule, plaintiff's references to his Muslim faith would be honored. *See* Memo in Support, p. 23. According to the amendment, the Oklahoma courts would be duty-bound to apply the "established common law." Thus, plaintiff's Muslim faith desires expressed in his will do not rest upon the adoption of Sharia law, only compliance with the common law rule that would honor the testator's desires.

For the reasons stated, plaintiff's allegations fall far short of alleging an injury in fact or law and, therefore, plaintiff has no standing, there being neither a case nor a controversy.

8

## II.   PLAINTIFF HAS FAILED TO MEET THE FOUR-PART TEST REQUIRED TO SUPPORT A PRELIMINARY INJUNCTION.

In its Order, this Court found that plaintiff had satisfied the four-part test governing the issuance of a temporary restraining order.  That same test governs plaintiff's pending motion for a preliminary injunction.  As was true of this Court's finding of standing, its previous finding does not foreclose a careful reassessment of the four factors before deciding whether to replace the temporary restraining order with a preliminary injunction.

As cited by this Court in its order, before a motion for a preliminary injunction may be granted, the movant must establish:  (A) a substantial likelihood of success on the merits; (B) irreparable injury to the movant if the injunction is denied; (C) that the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (D) that the injunction would not be adverse to the public interest.  Order, pp. 4-5.  Additionally, as the Tenth Circuit has explained, because a preliminary injunction "is an extraordinary remedy, the movant's right to relief must be clear and unequivocal."  *See* Kikimura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001).

### A.   Plaintiff Is Not Likely to Succeed on the Merits.

Plaintiff claims that the amendment approved by the vote in favor of State Question 755 is an unconstitutional establishment of religion and prohibition of his free exercise of his Muslim faith.  Neither claim is likely to succeed on the merits.

### 1.   Plaintiff's Establishment Claim Will Fail.

Plaintiff asserts that the amendment prohibiting the use of Sharia law in the exercise of judicial power violates the First Amendment guarantee against establishment of religion.

9

Before examining this claim under the traditional three-part test under <u>Lemon</u> v. <u>Kurtzman</u>, 403 U.S. 602 (1971), that normally governs establishment clause claims, it is important to acknowledge that, if the amendment does anything, **it prevents** the establishment of religion. By its express terms the amendment disallows the exercise of judicial power based upon Sharia law, a law that plaintiff maintains is central to his Muslim faith.  For example, if one applies the three-part <u>Lemon</u> test to plaintiff's insistence that Sharia law governs the probate of his last will and testament, plaintiff's promotion of Sharia law would fail every prong of the <u>Lemon</u> test.  It would not only fail for lack of a "secular" purpose, but its principal effect would be to advance the Moslem religion and entangle civil courts in religious doctrinal disputes.

By excluding Sharia law from consideration by the Oklahoma courts, the amendment would prevent any effort to infuse religious content into the law of the land.  What could be more secular in purpose than to exclude a thoroughly religious system of law like Sharia in which every duty is both religious and civic, and under which there is no separation of church and state!  Indeed, would not both the no-establishment and free exercise of religion guarantees prohibit such a system of law?

Plaintiff attempts to build his "no establishment" case, however, not on what the amendment actually does, but on an alleged "sectarian purpose" that motivated the amendment's proponents.  Indeed, plaintiff accuses one of the measure's sponsors to have acted with the "intent in crafting the Shariah Ban … to attach to Plaintiff's faith a profound stigma that would relegate Plaintiff to an ineffectual position within the political community." *See* Memo in Support, p. 8.  With regard to Sharia law, however, plaintiff is already in an "ineffectual position" within the American political community because there are aspects of

10

Sharia law that violate well-established norms of equality and separation of church and state.

Instead of pursuing a "sectarian purpose," as plaintiff has argued, the amendment's sponsors

were pursuing a secular purpose designed to protect the American legal system from an alien

system of law that would undermine well-established principles of equal protection of the law

and religious freedom.  Public concern about Sharia law is not rooted in hostility to a religion,

but a determination to resist an assault on the fundamental secular constitutional role of

government — protecting life, liberty and property.

For many Americans, the first indication that the American judicial system was

unprepared to face the stealth threat of Sharia law came from a case in New Jersey which

exposed its brutality.  This case involved the arranged marriage between a married couple of

Moroccan citizenship and Muslim faith.  The husband engaged in physically abusive behavior

toward his wife who was 17 years old at the time of their marriage in July 2008.  The details

of this abuse are set out in horrific detail by the New Jersey appellate court in <u>S.D.</u> v. <u>M.J.R.</u>,

415 N.J. Super. 417 (Sup. Ct., App. Div., 2010).  The abuse began as "punishment" for the

wife's inability to cook for the husband's guests, the husband pinched her "on her breasts,

under her arms, and around her thighs..." for "approximately one hour, during which time

plaintiff was crying."  Fifteen days later, for a similar reason, the wife reported her husband

"'took all my clothes off me ... [t]hen he started to pinch my private area.  And he was

pinching my tits or my chest area.  I was crying'" *Id.,* pp. 421-22.  The Court reported that

the wife "testified that defendant pulled her pubic hair ... her vaginal area was very, very red

and that it was hurting.  Although she attempted to leave, defendant had locked the door....

'He said to me, no, you can not go and sleep on the side of the bed.  You're still my wife and

11

you must do whatever I tell you to do.  I want to hurt your flesh, I want to feel and know that you're still my wife.'  After that — he had sex with me and my vagina was very, very swollen and I was hurting so bad.' [T]he entire episode took approximately two to three hours."  Other instances of marital rape occurred thereafter, until the wife escaped through a window and a woman who saw her called the police.  *Id.,* p. 423.  After a meeting with an Imam, the couple was persuaded to reconcile, but "on the night of the reconciliation, defendant again engaged in nonconsensual sex three times, and on succeeding days...."  "The plaintiff testified that defendant always told her 'this is according to our religion.  You are my wife, I c[an] do anything to you.  The woman, she should submit and do anything I ask her to do.'"  *Id.,* p. 424.  Thereafter, the husband "took plaintiff to the home of the Imam and, in the presence of the Imam ... defendant verbally divorced plaintiff."[1]

Even more shocking than the religious beliefs of the husband was the fact that an "Imam testified regarding Islamic law as it relates to sexual behavior [and] confirmed that a wife must comply with her husband's sexual demands..."[2]  *Id.,* p. 426.  Based on the defendant's and Imam's testimony, the trial court determined that:

---

[1]     The New Jersey Court did not address the aspect of Sharia law by which a husband may divorce his wife by stating "I divorce you" three times — known as a "talaq." In India, a talaq has been considered valid "on a mobile phone ... even if his wife is unable to hear it all the three times ..."  Moreover, "[i]n October, [an Indian] seminary had ruled that saying talaq three times even on a humourous note is valid as per the Sharia (Islamic Law) and the marriage stands nullified.  "Talaq uttered by Muslim man on cellphone valid," The Times of India, November 15, 2010. http://timesofindia.indiatimes.com/india/Talaq-uttered-by-Muslim-man-on-cellphone-valid-Deo band/articleshow/6930276.cms

[2]     "However, a husband was forbidden to approach his wife 'like any animal.'" *Id.*

12

> This court does not feel that … this defendant had a criminal
> desire to or intent to sexually assault … the plaintiff.… The
> court believes that he was **operating under his belief that** it is,
> as the husband, **his desire to have sex when and whether he
> wanted** to, was something that was **consistent with his practices**
> and it was something that was **not prohibited**.  [*Id.,* pp. 428.]

The appellate court rebuked the trial court in the most "politically correct" way possible, using

the word culture rather than religion, and stating:

> We are also concerned that the judge's view of the facts of the
> matter may have been **colored by his perception** that, although
> the defendant's sexual acts violated applicable criminal statutes,
> they were **culturally acceptable** and thus not actionable — a view
> that we have soundly rejected.  [*Id.*, p. 440.[3]]

Based on this case alone, is it any wonder that the American public, including the citizens of

Oklahoma, would want to constitutionally limit the authority of judges to apply Sharia law?

Finally, plaintiff has the temerity to argue to this Court that the exclusion of Sharia law

from the exercise of judicial power would excessively entangle the courts on doctrinal matters

regarding plaintiff's faith.  *See* Memo in Support, pp. 11-12.  Just the opposite would be true.

As plaintiff admits, "[t]here is no single religious text that all Muslims accept as the exclusive

source for … Shariah Law."  *Id.*  Therefore, he argues that to exclude Sharia law, Oklahoma

courts would get entangled in doctrinal matters to determine "what is and what is not Shariah

Law."  Perhaps.  But under the amendment, once it determined that something was Sharia law,

the state courts would be done with the matter.  If, on the other hand, Sharia law were a

---

[3]     A spokesman for the Council for American Islamic Relations responded to the
basis for the New Jersey decision as "absolute fantasy, and hateful."  Maxim Lott, "Advocates
of Anti-Shariah Measures Alarmed by Judge's Ruling," FoxNews.com, August 5, 2010,
http://www.foxnews.com/us/2010/08/05/advocates-anti-shariah-measures-alarmed-judges-ruling/.

13

permissible source of law to be administered by the state courts, there would be an even

greater risk of entanglement in Moslem doctrinal matters.  There are numerous cases in

American jurisprudence dictating that secular courts stay out of religious disputes.  *See*, *e.g.*,

Watson v. Jones, 80 U.S. 679, 730 (1872); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94,

107, 109 (1952); Kreshik v. St. Nicholas Cathedral, 363 U.S. 190 (1960).

In sum, plaintiff's no-establishment claim fails all three prongs of the Lemon test.

### 2.    Plaintiff's Free Exercise Claim Will Fail.

Plaintiff's free exercise claim rises or falls on plaintiff's allegation that his Muslim faith

has been specially targeted — discriminated against.  As pointed out above, however, the

amendment specifically mentions Sharia law, but does not single it out for discriminatory

treatment.  The amendment not only bans Sharia law as a source of law in the exercise of state

judicial power, but it bans all "legal precepts of other nations or cultures."  Further, the

amendment links its ban on Sharia law with its ban on "international law."  So it does not

single out Sharia law for discriminatory treatment.  But the Sharia Law ban is one of many

subsets excluded by a generally applicable law, namely, that Oklahoma judges are duty-bound

to apply federal and state law, as reflected in statutes and the "established common law."

Thus, the amendment does not prohibit the free exercise of religion, according to the rule laid

down in Employment Division, Department of Human Resources of Oregon v. Smith, 494

U.S. 872, 878 (1990).

Plaintiff attempts to get out from under the Smith rule by claiming that the amendment

discriminates against him by prohibiting him from engaging in "religious practice."  *See*

Memo in Support, p. 13.  Thus, plaintiff places great reliance on the ruling of the Supreme

14

Court in <u>Church of Lukumi Babalu Aye, Inc.</u> v. <u>City of Hialeah</u>, 508 U.S. 520 (1993).  In that case, however, the city ordinance discriminated against the Babalu Aye sect in the conduct of a private religious worship.  The amendment at issue in this case does not prohibit any private Moslem worship or plaintiff's moral conduct.  Plaintiff may, as he did before the vote passing the amendment, "greet[] others with a smile," "wak[e] for the customary prayer at dawn," "scrupulously attend[] to fairness in his business dealings," and otherwise conduct himself in a manner consonant with the teachings of "the Quran and Islam's prophetic teachings."  *See* Memo in Support, p. 4.  After all, the amendment at issue applies only to the exercise of judicial power and governs only the civil government officials who are empowered with the judicial authority of the state.

In short, the amendment does not prohibit plaintiff from the free exercise of religion.  It simply prohibits the use of state power to impose by force those duties that properly fall within the jurisdiction of the state's judicial branch — such as the protection of women from "underage and forced marriage … honor killing … female genital mutilation … polygamy …

and domestic abuse … including marital rape …"[4] — practices existing in Islamic nations

governed by Sharia law that deprive persons of their lives, liberties, and pursuit of happiness.

**B.     Plaintiff Will Not Suffer Irreparable Harm.**

Relying solely on <u>Elrod</u> v. <u>Burns</u>, 427 U.S. 347 (1976), plaintiff claims irreparable

harm if the Oklahoma Election Board certifies the passage of State Question 755.  In <u>Elrod</u>,

however, the plaintiffs were threatened with the immediate loss of their jobs, a loss allegedly

caused by a denial of their First Amendment rights.  There is nothing in plaintiff's complaint,

or in his memorandum in support to indicate that plaintiff is threatened with any such economic

loss.  Indeed, the only claimed economic loss that plaintiff could think of related to the

possible prevention of the probate of his estate.  Memo in Support, pp. 22-23.  Such an

eventuality is remote, and would be unaffected by the certification of the passage of the

amendment.  Such certification does not foreclose a First Amendment challenge should

plaintiff's fears become reality.

---

[4]     Center for Security Policy, <u>Shariah: The Threat to America</u> (2010), p. 12,
www.centerforsecuritypolicy.org (footnotes omitted).  The following citations are contained in
the footnotes of that report:
    "Quran Sura 65:4 describes the waiting period for a divorce to be final: 'Such of your
women as have passed the age of monthly courses, for them the prescribed period, if ye have
any doubts, is three months; and for those who have no courses (it is the same).'"
    "'Umdat al-Salik, Chapter ol.2, pgs. 583-84 enumerates those categories of Muslims
who 'are not subject to retaliation' for killing: '(4) a father or mother (or their fathers or
mothers) for killing their offspring, or offspring's offspring.'"
    "'Umdat al-Salik, Chapter o4.3: 'Circumcision is obligatory (for both men and
women…..for women, removing the prepuce of the clitoris…).'"
    "Quran Sura 4:3: '…marry women of your choice, two, or three, or four…'"
    "Quran Sura 4:34: '….And to those women on whose part ye fear disloyalty and
ill-conduct, admonish them (first), (next) refuse to share their beds, (and last) beat them….'"
    "Quran Sura 2:233: 'Your wives are as a tilth unto you, so approach your tilth when or
how ye will….'"

16

The only other harm that plaintiff has identified is his claim of "stigma and embarrassment" and "isolat[ion] [of] his faith for public censure." *Id.*, p. 22. But that loss, if real, was suffered by plaintiff on November 2, 2010, when the amendment was approved by 70 percent of Oklahoma voters. The certification of the passage of the amendment would in no way alleviate such a loss. Nor would such certification have any impact on the outcome of this litigation should plaintiff prevail on the merits.

### C.     The Balance of the Equities Is Against the Plaintiff.

Plaintiff's claim for immediate relief turns on the impact that defendants' certifying the passage of State Question 755 would have. According to plaintiff's complaint and supporting memorandum, the act of certification would make the amendment legally effective. *See* Complaint, ¶ 4. Because the Oklahoma Election Board's act of certification is a ministerial one, involving no exercise of discretion, it is difficult to understand how such certification would add to the alleged harm that resulted from the passage of the amendment. In no way would certification prejudice plaintiff in the prosecution of this lawsuit. Nor would such an act add anything to the alleged injury to plaintiff that he has not already allegedly suffered.

In contrast, the interest of the people of Oklahoma is significant. According to Oklahoma law, the people have the authority to amend their constitution, and governing officials have no discretionary power to stop a constitutional amendment from coming into legal effect. Nor does this Court have any such power. To the contrary, the legal effectiveness of a vote to amend the constitution is an issue of state, not federal, law. The only authority conferred upon this Court is to review its constitutionality. Even if this Court should find that the measure is unconstitutional, and its decision is affirmed by the Supreme Court, the

17

amendment is not erased from the constitution, but remains on the books, and could be revived should the constitutional question be decided differently at a later time.  *See* 74 *Opinions of the Maryland Attorney General* 19, 32 (1989).

>    **D.    The Public Interest Favors Defendants.**

It is true, as this Court stated in its Order "'[i]t is always in the public interest to prevent the violation of a party's constitutional rights.'"  Order, pp. 8-9.  But, as the Order further states, it is also in the public interest to carry out the will of the voters.  *Id.,* p. 8. Indeed, when the will of the voters is expressed, as here, to amend the constitution, it is in the paramount public interest to ensure that the "consent of the governed" is implemented, for it is from that consent that government officials "derive their just powers."  *See* Declaration of Independence.

**CONCLUSION**

For the foregoing reasons, the Court's Temporary Restraining Order should be dissolved, and the complaint dismissed.

Respectfully submitted,

| | |
|---|---|
| Of Counsel: | /s/KEVIN CALVEY* (Bar No. 16190) |
| HERBERT W. TITUS | 4244 Cherry Hill Lane |
| WILLIAM J. OLSON | Oklahoma City, OK  73120 |
| JOHN S. MILES | (405) 808-0041 |
| JEREMIAH L. MORGAN | kevincalvey@gmail.com |
| WILLIAM J. OLSON, P.C. | |
| 370 Maple Avenue West | *Counsel of Record* |
| Suite 4 | *Attorneys for Amici Curiae* |
| Vienna, VA  22180-5615 | |
| (703) 356-5070 | |

November 16, 2010